# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00109-CV

### In re Texas Department of Family and Protective Services

### ORIGINAL PROCEEDING FROM BASTROP COUNTY

## O P I N I O N

Relator Texas Department of Family and Protective Services filed a petition for a writ of mandamus seeking to vacate the county court at law's December 13, 2006 order returning two foster children to their foster parents and finding that there was "no abuse, exploitation, or neglect" of the foster children by their foster parents. The abuse allegation involved an eight-year-old foster child, C.L.H., who along with a sibling, C.M.H., was under the permanent managing conservatorship of the Department. C.L.H. and C.M.H. had been moved into and out of multiple foster homes since 2004. In 2006, the court placed both children in the foster home of D.W. and T.H.,[1] who planned to adopt the children. The trial court expressly retained jurisdiction over the suit establishing the Department as the children's managing conservator under the family code. *See* Tex. Fam. Code Ann. §§ 155.001-.003 (West 2002). In addition, the court had previously appointed an attorney ad litem and a guardian ad litem for C.L.H. and C.M.H.

---

[1] The Department requested that all children and foster parents be identified only by their initials.

The Department's petition claims that the court abused its discretion by enjoining the Department from proceeding with its investigation into the abuse allegation, entering its own finding of "no abuse," and ordering that the children be returned to their foster home. At oral argument however, the Department conceded that: (1) the court had the continuing jurisdiction and duty to place the children and to make a finding in the best interest of the children; and (2) in making its best-interest finding, the court could consider whether abuse occurred but could not memorialize its decision about the alleged abuse on the record or in writing. We deny the Department's petition.

The first information pertaining to the incident of alleged abuse was provided voluntarily by foster parent D.W., who left a telephone message and sent a "restraint report" by facsimile to a caseworker at A World For Children, the child placement agency licensed by the Department to provide foster care for C.L.H. and C.M.H. The report detailed the actions taken on October 21, 2006, during a physical outburst by C.L.H. Included with the report was a detailed explanation of how D.W. applied a restraint method that she had learned from A World For Children during foster-parent training and a four-page journal recounting the daily events in the home and C.L.H.'s behavioral patterns on the day of the incident and on the days preceding and following it.

The day after D.W. left her telephone message, Kim Nicholas, a caseworker from A World For Children, picked up C.L.H. to drive her to a scheduled therapy appointment.[2] During this

_____

[2] The parties do not dispute that C.L.H. and C.M.H. have serious needs, including regular medication and therapy. The Department classifies children's needs within a four-level hierarchy, from "basic" to "intense" (usually requiring a residential treatment center). 40 Tex. Admin. Code §§ 700.2301-.2363 (2007). C.L.H. and C.M.H. have needs that are classified at the third level, meaning that they require a "specialized" level of care. *See id*. § 700.2343. Children who require specialized services have "severe problems in one or more areas of functioning." *Id*.

2

trip, C.L.H. told the caseworker that D.W. had slapped her.[3] According to Nicholas, C.L.H. had a "black eye." Nicholas attempted to photograph the "black eye" with her cellular telephone.[4] She also notified the regional director of A World for Children, Lorraine Guerrero, about C.L.H.'s statement. Guerrero in turn notified the program director, Rebecca Allen. Guerrero testified that she and Allen conferred by telephone, made the decision to remove the children from the home,[5] and "notified Child Protective Services." This decision was made without further interview of C.L.H., any interview of the foster parents, or any further investigation.

Nicholas placed a telephone call to Jennifer Deazvedo, an adoption unit worker in the Department's Child Protective Services division, and requested that C.L.H. and C.M.H. be removed from the foster home. Deazvedo did not interview C.L.H. or C.M.H. Nor did she speak with her supervisor or the program director because she was unable to "get in touch with" them. Deazvedo had never exercised sole authority to make a removal decision, and she "really didn't know what to do" because she "never had cases like this."

Nevertheless, Deazvedo agreed to the children's removal from the home of D.W. and T.H. Deazvedo did not notify the court, the children's attorney ad litem, or the children's guardian ad litem (CASA) of the fact that A World for Children was unwilling to keep C.L.H. or C.M.H. in their current foster home. Asked whether it seemed logical for the Department, the children's

---

[3] The record suggests that C.L.H. may have informed the court that she was injured when D.W. attempted to restrain her and both of them fell. This report to the court is consistent with D.W.'s account of the incident.

[4] No "black eye" or other injury is discernable from the photographs presented to the court.

[5] Guerrero denied that she would have decided to remove C.L.H. if C.L.H. had stated that she hit her eye on a recliner when D.W. attempted to restrain her and both of them fell.

permanent managing conservator, to allow a foster home agency to remove the children before any investigation was done—possibly creating a problematic situation for the children—Deazvedo responded, "Well if they are the child[-]placing agency, I can't make them keep the children in their home." She later recanted that testimony, acknowledging that she could have informed the child-placing agency that the children were being placed in their current foster home and that the agency could not remove them. Deazvedo further stated that she initially wanted to place a call about the incident to an agency hotline and "keep the children in the home while it's being investigated." But when she was informed that A World for Children was unwilling to keep C.L.H. and C.M.H. in the home because of their concerns about their own potential liability, she agreed to the children's removal. She thought, "[W]e'll just go ahead and remove and do the investigation and see what the outcome is of that investigation."[6] Deazvedo denied that A World for Children makes the decisions about whether children should be removed: "It was staffed with me, and I decided to go with what they decided." Deazvedo clarified that by "staffing" with A World for Children, she referred only

---

[6] In exigent circumstances, including cases involving issues of child sexual abuse or child endangerment due to use or manufacture of illicit drugs by a parent or person who has possession of the child, the family code permits a representative of the Department to take possession of a child without a court order if the representative has a reasonable belief—based on personal knowledge of facts or information from another that is corroborated by personal knowledge of facts—that the child's health or safety is in "immediate danger." Tex. Fam. Code Ann. § 262.104 (West Supp. 2007).

Here, the children were removed because Deazvedo perceived a "risk" of abuse and A World for Children expressed concerns about its potential liability. There was no evidence that C.M.H. and C.L.H. were removed from their foster home with D.W. and T.H. because their health or safety were in any "immediate danger." In fact, the Department informed the trial court that it did not oppose placing C.M.H. and C.L.H. with D.W. and T.H. and that it was probably in the children's best interest to return them to D.W. and T.H.

4

to her telephone conversation with Nicholas. Deazvedo never spoke with the agency's regional director, Guerrero; its program director, Allen; the children's guardian ad litem, the children's attorney ad litem, or the court before agreeing to remove the children.

Deazvedo did not discuss the matter with anyone else at Child Protective Services, either.[7] On October 23, 2006, two days after the alleged abuse incident and without notice to the children's attorney ad litem, their guardian ad litem, or the court, Kim Nicholas removed C.L.H. and C.M.H. from D.W. and T.H.'s home. The children were placed in yet another foster home overseen by A World For Children.

After C.L.H. and C.M.H. were removed, D.W. and T.H. filed a motion for an evidentiary show-cause hearing, and the Department filed a motion for continuance. In their show-cause motion, D.W. and T.H. asked the court to determine whether the removal of C.L.H. and C.M.H. from their home was proper and in the children's best interest. The Department's motion urged the court to postpone any ruling on the children's placement until after the Department's investigation into the alleged abuse was complete.

At the beginning of the November 14, 2006 hearing on the Department's motion for continuance, the court noted that it had met in chambers with C.L.H. and C.M.H. in the presence of their attorney ad litem; counsel for Child Protective Services; a representative from the guardian ad litem, Court Appointed Special Advocates (CASA); the Department's investigator for residential child care licensing; and "everybody else here involved in the case." The court then heard argument

---

[7] Deazvedo testified that if she could go back and do anything differently, she "would have made sure that [she] found a supervisor."

from the Department about postponing any ruling on placement pending the completion of the investigation[8] and from the attorney ad litem and CASA, who recommended returning C.L.H. and C.M.H. to D.W. and T.H. because their reunification would not hinder the investigation and would be in the children's best interest. Opposing the reunification of the foster family at the initial hearing on the motion for continuance, the Department noted that if the children were returned to D.W. and T.H. while an abuse investigation was pending, the foster parents would lose their license as a foster family with A World for Children. The Department also stated that if Child Protective Services issued a finding of "reason to believe" ("RTB") that abuse occurred, D.W. and T.H. would not be approved for adoption.[9]

Halfway through the hearing, the court stated that the Department's finding with respect to whether there was "reason to believe" that abuse occurred was the real issue, not a week-long continuance or the completion of an investigation. The court expressed its concern about the duration of the placement dispute, stating that "instead of [the Department] making a decision, going in front of an administrative judge and appealing and on and on and on," it might be better to allow the court to make a decision based on the evidence. It further noted that "the kids said they wanted to go back, the kids' attorney says they should go back, CASA [the children's guardian ad litem] says it's in the best interest of the children to go back, and not just a week from now, but now. The

---

[8] The investigator informed the court that the tasks remaining to be done were his contacts with two people—C.L.H.'s teacher and the children's therapist—and going through the "staffing process" with his supervisor.

[9] At a subsequent hearing on November 21, 2006, the Department noted that another consequence of a "reason to believe" finding is that the Department's financial assistance for the needs of the children (with the possible exception of Medicaid) is forfeited.

children have told me that they want [T.H. and D.W.] to be their mom and dad forever—I don't want to lose sight of that." Disagreeing with the court's suggestion, the Department asserted that "[t]he finding—the investigation and the determination of ruled out, unable to determine, reason to believe, those are internal CPS mechanisms" which are reviewed administratively and are not something that the court could decide. But the court pointed out that it was charged with making a decision that would be in the children's best interest: "I don't see a [] statute regarding RTB. I do find a statutory duty on my part." The court then granted the continuance but orally enjoined the Department from making "any official finding" as to whether the abuse occurred.[10]

A week later, on November 21, 2006, the court held the show-cause hearing. It reiterated that it had continuing jurisdiction to make findings that were in the best interest of C.L.H. and C.M.H. and was "mindful" of the family code's mandate that the paramount concern for the court was the best interest of the children. It also expressed its concern that the due process rights of C.L.H. and C.M.H. were being lost in the system:

> [W]hat if you have a situation where they [the Department] don't follow their own rules, or they want to follow some of the rules and not all of the rules? And what if —what if no notice is given to the Court or to an attorney ad litem or to a guardian

---

[10] The Department's assertion that it was enjoined from "proceeding with its investigation" is contrary to the record. In the record, the court enjoins only the Department's ultimate finding on whether there was reason to believe that the alleged abuse occurred:

> I don't believe there's any harm in having him complete the investigation, but make no determination until we get back here. . . . I don't think there's any harm in saying in the meantime don't make a decision. Just do your investigation.
>
> . . . .
>
> I'm going to place an injunction on making any official finding . . . .

7

ad litem [so] that some children are lost in the system and, thereby, denying these children due process?

What if also in the bottom line if children are denied benefits that they—that every other child would get?

. . . .

[T]hese children were lost in the system. The department that you represent did not notify the children's attorney, did not notify the children's guardian ad litem. Are you sure that they want that kind of exposure?

We have in place a system. Children have an attorney for more reasons than just simply being in court. It's so that they also don't get lost in the system. And no one wanted to notify these people, and I have some concerns about whether or not that denies these children due process.

The guardian ad litem, CASA, testified at the show-cause hearing through its executive director, Joan Martin Thurman, who had been involved with C.L.H. and C.M.H.'s case "since its inception." She stated that the children had bonded with T.H. and D.W., that they "were very happy as long as they were with [T.H. and D.W.]," and that the children "did not want to leave [T.H.] and [D.W.]." She also opined that the children needed stability and that returning the children to D.W. and T.H. was in the children's best interest: "There is a bond there. There is a love there. You've got a couple that's willing to work with these children and help them through the tough times, and you've got children that truly love this couple, and I don't know why we would destroy that." Thurman further stated that she "truly believed" that D.W. and T.H. were committed to C.L.H. and C.M.H. and had "no doubt" that they would take care of the children. "I would gladly hand them my grandchildren at any point," she testified, "I trust them totally."

8

During the show-cause hearing, counsel for the Department stated that the purpose of the hearing and "the question before the Court is whether to place the children back with [T.H. and D.W.] or not, and I think that's a valid issue." This discussion followed:

> Court: And what do you believe is in the best interest of the child—of the children?
>
> Counsel: I think it's probably in the best interest to place them back with [T.H. and D.W.].
>
> Court: Okay. Then why hasn't your client done that?
>
> Counsel: I don't know.

After a brief recess, counsel stated twice that the Department did not oppose returning the children to T.H. and D.W. : "The Department technically can't recommend re-placing with [T.H. and D.W.], but due to the totality of the circumstances and the bond that they have with the kids, we don't oppose it." Counsel continued, "We can't recommend re-placement as long as an investigation is going forward, but we don't oppose it." At the conclusion of the hearing, the court orally found "no abuse," ordered C.L.H. and C.M.H. returned to their foster home,[11] and lifted its prior injunction.

The following week, on November 28, 2006, the Department concluded that there was reason to believe that abuse had occurred. D.W. and T.H. filed a request for administrative review of the Department's investigative findings and sought reversal of the RTB finding.[12]

---

[11] Despite the evidentiary record and the court's ruling, A World for Children terminated its agency agreement with D.W. and T.H. immediately after the hearing on November 21.

[12] The parties' briefing suggests that this administrative review remains pending.

9

On December 13, 2006, the court issued its Order in Suit Affecting Parent-Child Relationship confirming its rulings from the November 21 hearing. The order states that the court "has jurisdiction" and that "no other court has continuing, exclusive jurisdiction." It continues:

> The Court finds that allegations of abuse by [T.H.] and/or [D.W.] have been investigated by the [Department]. . . [and] that pursuant to Texas Family Code section[s] 261.001 [and 261.401], no abuse, exploitation, or neglect of the children . . . has occurred. . . . IT IS ORDERED that the children . . . shall be immediately returned to the home and the care of [T.H.] and [D.W.], as adoptive foster parents . . . [and that the Department] may continue with [its] investigation[13]. . . . [A]ll relief requested in this case and not expressly granted is denied.

The following month, the court received the Department's periodic Placement Review Report for C.L.H. and C.M.H.:

> The current placement of the child(ren) appears to be safe and appropriate. [The trial court] ordered the children returned to the current home [D.W. and T.H.] even though an Investigation for Physical Abuse was RTBed. The family can[] no longer be licensed through an agency due to this disposition. They are appealing this decision but until the appeal is overturned, the children can only be placed with the family as Fictive Kin placement. The family maintains contact with the Adoption Prep Supervisor, Suzie Tucker. Contacts are made with the children and the home is to be visited on a quarterly basis to ensure the safety and appropriateness of the placement. The family is bonded to the children and seem to be meeting the children's needs at this time. The children are attending medication reviews and therapy.

---

[13] The court's prior statements in the record clarify that the Department was to continue its investigation but was enjoined from making an "official finding" concerning the allegation of abuse. This part of the court's order lifted the injunction and permitted the Department to make its finding.

*See id*. §§ 263.501-.502 (West Supp. 2007), .503 (West 2002) (discussing required placement review, report, and hearing for children who are under Department's managing conservatorship). Shortly after filing its report with the court, the Department filed this petition for writ of mandamus.

Mandamus relief is proper only to correct a clear abuse of discretion when there is no adequate remedy by appeal. *In re Tex. Dep't of Fam. & Protective Servs.*, 210 S.W.3d 609, 612 (Tex. 2006) (orig. proceeding). Issuance of mandamus is improper if the trial court did not abuse its discretion or if the record fails to demonstrate the lack of an adequate remedy on appeal. *Id.* A trial court abuses its discretion if it erroneously applies the law to the facts, or if it errs in determining the law. *In re Bruce Terminix Co.*, 988 S.W.2d 702, 703 (Tex. 1998) (orig. proceeding). Here, our task is simplified considerably by the Department's concessions at oral argument.

With regard to the Department's first argument—whether the court abused its discretion by enjoining the Department from proceeding with its investigation into the abuse allegation—we conclude that any dispute concerning the alleged injunction is long-since moot. The week-long injunction was lifted on November 21, 2006. Since that time, the Department has not been enjoined from making whatever findings it believed appropriate.[14] In fact, the record suggests that the Department issued its finding of "reason to believe" on November 28, 2006.

With regard to its second and third arguments—whether the court abused its discretion by entering its own finding of "no abuse" and by ordering that the children be returned to their foster home with D.W. and T.H.—the Department has conceded that: (1) the court had the continuing jurisdiction and duty to place the children and to make a finding in the best interest of the

---

[14] When the court inquired on November 21, 2006, whether the investigation had been completed but for making a finding, counsel for the Department stated, "I think that all the evidence has been collected, yes, sir."

11

children; and (2) in making its best interest finding, the court could consider whether abuse occurred. However, the Department takes the position that the trial court was prohibited from articulating the reason for its best interest finding on the record or in writing.[15]

We agree with the Department that under the family code, the court had not only the power but also the duty to decide whether abuse occurred as part of its finding about the placement that would be in the best interest of the children. When the court entered a final order on May 2, 2006, terminating the parental rights of C.L.H. and C.M.H.'s biological parents and establishing

[15] The Department of Family and Protective Services concedes that it is in the best interest of C.L.H. and C.M.H. to live with D.W. and T.H. The Department also concedes that this is a determination that the trial court had the power to make and, as a matter of law, was obligated to make. The Department also agrees with the trial court's conclusion regarding where the children should be placed. At the hearing before the trial court, the Department's counsel conceded that it was in the best interest of the children to return to the custody of D.W. and T.H. Indeed, every entity and person involved in this matter agrees that it is in the best interest of the children to live with their current foster parents. This includes the children's attorney ad litem, the children's guardian ad litem (CASA), the trial court, the Department, the foster parents, and, importantly, the children.

After the trial court fulfilled its obligation in making a determination of the children's best interest—consistent with the views of the Department and the Department's counsel—the Department sought mandamus in this court for the sole purpose of attacking the trial court's finding that the alleged abuse that generated this entire incident did not occur. The court's finding was attacked despite the fact, conceded by the Department, that such a finding is integral to any determination of whether re-placement of the children in the same foster home would be in their best interest. The Department acknowledges not only that the trial court had the power and obligation to make a best interest determination, but also that the trial court could take into consideration and come to a determination in its own mind whether any abuse had occurred. The Department believes this mandamus action is necessary to pursue the curious position that although the trial court could consider whether abuse occurred and could actually base its best interest determination on whether the alleged abuse occurred, the trial court should be prohibited from writing down the basis of its best interest determination or revealing it on the record. The reason for this is that the Department wants to reserve for itself the ability to decide as a matter of record in the first instance—before the court or anyone else—whether the alleged abuse occurred. This position reflects far too fine a legal distinction, particularly where the very real lives of two young children without their biological parents are concerned as well as the reputation and resources of a conscientious and caring foster couple. We question whether the pursuit of this matter (together with the way it is being pursued) is serving the best interests of the children involved or is a worthy use of limited State resources.

12

the Department as the permanent managing conservator, the court acquired continuing jurisdiction over C.L.H. and C.M.H. and retained the power to make future modifications to its order. *See* Tex. Fam. Code Ann. §§ 155.001-.003. The order in this case was issued in the context of the court's continuing jurisdiction over a suit affecting the parent-child relationship, and allegations of abuse required the court to consider the propriety of the foster children's placement and the best interests of those children. *See id*.; *see also id.* §§ 101.032 (defining suit affecting parent-child relationship), 153.002 (establishing best interest of child as court's primary consideration in determining issues of conservatorship, possession, and access to child), 263.002 (West 2002) (requiring court to hold hearing to review conservatorship appointment and substitute care in cases where Department has been named managing conservator); *see also In re C.G.B.*, 163 S.W.3d 805, 807-08 (Tex. App.—Texarkana 2005, no pet.) (affirming district court's power, as part of court's continuing statutory duty to oversee children's case, to enter order exonerating foster family of any wrongdoing toward their foster children). As part of its obligation to consider and rule on the best interests of C.L.H. and C.M.H., the trial court had jurisdiction to consider where C.L.H. and C.M.H. should be housed and who should have possession of them. In making this determination, the court also had jurisdiction to consider and decide whether any abuse had occurred.

In addition, the record supports the court's ruling regarding the placement that was in the best interest of the children and its finding concerning the alleged abuse. The court had evidence that C.L.H. and C.M.H. are bonded to D.W. and T.H. It heard testimony that the children require a "specialized" level of care and that their removal from D.W. and T.H.'s home would adversely affect the benefits that they receive as well as their hopes of being adopted by D.W. and

13

T.H. Further, the record suggests that C.L.H. provided the court with a different version of the incident that spawned the abuse allegation from that provided to caseworker Nicholas.

The finding of "no abuse, exploitation, or neglect" in the court's order was relevant and necessary to support the court's ruling that placement with D.W. and T.H. was in the best interest of C.L.H. and C.M.H. and that the children should return to that home. Without such an express finding, a ruling that it is in the children's best interest to return to the home where the alleged abuse occurred is either: (i) an implied finding that the abuse did not occur, or (ii) an abuse of discretion. But after oral argument, the Department's only remaining complaint is that the court's decision about the alleged abuse should have been provided by implication only—not stated on the record or reduced to writing. We reject the Department's unsupported assertion that the county court at law abused its discretion by expressing the rationale for its placement ruling on the record during the hearing and in a subsequent written order.[16]

The Department's petition for writ of mandamus is denied. *See* Tex. R. App. P. 52.

---

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Waldrop and Henson

Filed: December 19, 2007

---

[16] Our resolution of the mandamus issue does not require us to address questions concerning any collateral estoppel or res judicata effect of the court's order on an administrative proceeding, and we express no opinion as to those issues.