# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00131-CV

**Cassandra Donetta Medrano, Appellant**

**v.**

**Lydia Serna Zapata, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. D-1-AG-98-004762, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This is an appeal from a final order naming a teenage boy's mother and paternal grandmother as his joint managing conservators and giving the grandmother the exclusive right to determine his primary residence. We must address two questions, both of which implicate Texas courts' subject-matter jurisdiction to resolve the underlying dispute: (1) whether this appeal was rendered moot when the teen was emancipated earlier this year; and (2) whether the grandmother had standing to seek managing conservatorship. We conclude that this appeal remains live and justiciable because it implicates not only rights and duties of the parties that terminated upon the teen's emancipation, but also monetary relief awarded in the order. As for standing, the constraints imposed by our standard of review compel us to affirm the district's court's order.

## BACKGROUND

Appellant, Cassandra Donetta Manor Medrano, was formerly married to Paul Medrano, and Paul Medrano is the son of the appellee, Lydia Serna Zapata. There were two children of Cassandra and Paul's marriage, J.M. and C.M., fraternal twins who were born in 1995.[1] The divorce decree that ended the marriage, signed in 1999, named Cassandra as sole managing conservator with the exclusive right to establish the twins' primary residence. Paul was named possessory conservator, with the right to visitation during one weekend per month, beginning Friday evening and concluding Sunday afternoon, and at such other times as he and Cassandra might agree.

The provisions of the divorce decree governing conservatorship and possession remained unchanged as J.M. and C.M. grew from young children into teenagers. During these years, it is undisputed that Paul rarely exercised his visitation rights and had no significant fatherly role beyond paying court-ordered child support. In contrast, Cassandra, by all accounts, was a highly engaged parent who, despite facing the challenges of single motherhood, placed the twins on a high trajectory of academic achievement; extensive involvement in church, youth sports, and other enriching activities (with Cassandra faithfully attending their games, concerts, etc.); and bright prospects for college and beyond. Meanwhile, she worked full-time to support the family (including, in addition to providing a house in which they could live, setting aside college funds for both boys),[2]

---

[1] Because various participants in the underlying events share common surnames, we have used first names as necessary for clarity.

[2] At the time of the trial court proceedings from which this appeal arose, Cassandra worked for the Texas Department of Criminal Justice.

2

progressed toward an associate's degree at Austin Community College, and even ran several marathons.

Still further challenges for Cassandra came in May 2009, as J.M. and C.M. were finishing middle school, when she gave birth again—remarkably, to a second set of twin boys—the product of a relationship that ultimately did not lead to marriage. Further compounding the stresses and demands of parenting an infant, let alone twin infants, the new babies arrived prematurely and remained hospitalized for a month or more following their birth.[3] Nevertheless, at least in the eyes of outside observers who would later testify in her behalf, Cassandra seemed to be making it all work somehow, and phrases like "the best mom I've ever seen" were used to describe her.

But beneath the family's positive exterior visage, Cassandra's relationship with one of the older twins, J.M., was growing increasingly frayed and volatile. As early as J.M.'s tenth or eleventh year, according to Cassandra, he had started becoming increasingly distant and isolated from the rest of his family, a development she perceived to stem from the absence of a father figure in his life. By June 2009, not long after the new twins had arrived, Cassandra (who had been seeing a therapist or counselor herself) had seen fit to arrange a session of family counseling to address J.M.'s behavior. The rift widened further after J.M. and C.M. entered Austin's Eastside Memorial High School that fall. A recurrent source of conflict was J.M.'s involvement in the school's robotics program, which required an extensive time commitment after school and even on Saturdays. Although initially supportive of J.M.'s participation, Cassandra came to perceive that the teen was defying her in staying at school later than she had planned or anticipated, which disrupted and

---

[3] However, there was evidence that the father of Cassandra's most recent set of twins has assumed a more extensive co-parenting role than Paul ever did.

complicated the afternoon's transportation and child-care logistics she had arranged, and that he was also misleading her by claiming that he was at school participating in robotics when in fact he was hanging out with friends or—in further disobedience of his mother—a girlfriend, an extent of relationship that Cassandra had forbidden at J.M.'s age of fourteen. Adding further concern and aggravation were repeated instances when J.M. had made his way homeward in the evening via a Cap Metro bus, a means of transportation that Cassandra had strictly prohibited.

Such facts are consistent with the sorts of struggles for identity and independence that are familiar to parents of teenagers, not to mention indicative of the love of a parent who admirably cares about her children's performance at school and what occupies their time after dismissal (unfortunately a rarity, it often seems, in the youth-related cases that come before this Court). However, there was additional evidence, albeit hotly disputed, that the conflict between J.M. and Cassandra had acquired a character and intensity that was more troubling. In February 2010, J.M. made an outcry at school claiming that Cassandra had punched him in the face, giving him a nosebleed. He would further allege that his mother had been similarly inflicting punches, slapping, hair-pulling, scratching, and other physical violence on him for several years, and that she had become more prone to do so, and to do so suddenly and explosively ("zero to a hundred," as he would put it), following the birth of the younger twins. Cassandra denies that this alleged violence ever occurred, and claims that she had ceased even to spank the older twins by this age, opting instead to enforce discipline by the withholding of favored activities. Subsequently, however, in April of that year, Cassandra acknowledges that she and J.M. had a physical altercation in which she bit into his arms or wrists, leaving wounds visible several days later, although she insists that she acted in self-defense.

4

For assistance with the task-juggling that her many roles had required of her, especially after the new twins were born, Cassandra had to some extent enlisted the help of extended family who lived around Austin, and this had included not only her own mother but also Lydia and Lydia's current husband (and step-father to Paul), Arthur Zapata, to whom Lydia had been married since the early 1990s. Despite the history between Cassandra and Paul, Lydia had pitched in to help with the care and transportation of J.M. and C.M. (who were, after all, her grandsons) and the occasional purchase of shoes and the like for them, in the manner that grandparents often do. Similarly, at least since her grandsons' middle-school years, Lydia and Arthur had with some regularity kept them overnight during the monthly visitation period to which the divorce decree had entitled Paul,[4] as well as on various other occasions, such as when Cassandra went on an out-of-town trip. As the conflict between Cassandra and J.M. had escalated, the teenager had sought refuge, as he saw it, with Lydia, and Lydia had likewise begun interceding into the disputes (or, as Cassandra saw it, meddling and undermining) on his behalf.[5] In the aftermath of the April incident, J.M. called Lydia, crying, claiming that Cassandra had threatened to have him sent to a juvenile detention facility or a mental institution, and seeking her help. Lydia and Arthur persuaded Cassandra to allow the teen to stay in their home, affording the combatants a "cooling-off" period.

---

[4] In fact, Cassandra and Paul's divorce decree had required that the exchange of the twins at the beginning and conclusion of any visitation with Paul would go through "Mother of Respondent"—i.e., Lydia—and that any such visits "shall be supervised by the mother of Respondent or by some other competent adult as designated by [Cassandra]."

[5] Conversely, there was evidence that J.M.'s twin, C.M., maintained a more peaceful relationship with Cassandra and was more distant from Lydia. As his twin's conflict with Cassandra intensified, C.M. tended to side with his mother and echoed her perception that Lydia was an interloper attempting to break up their family.

J.M. would remain in Lydia and Arthur's home until Sunday, May 9, 2010—Mother's Day. At Cassandra's insistence, J.M. spent the day with her and her other children. At the conclusion of what he and Lydia purportedly had anticipated would be only a day-long outing, Cassandra made J.M. return to her home. Professing fear of physical abuse if he returned, J.M. called Lydia and also the police. The police ultimately left him in Cassandra's possession, inasmuch as she had legal custody.

A few days afterward, May 12, 2010, Lydia filed a suit to modify Cassandra's divorce decree, seeking, among other relief, to be appointed J.M.'s joint managing conservator with Cassandra and be given the exclusive right to determine J.M.'s primary residence. She would later amend her petition to seek sole managing conservatorship. On the same day Lydia filed her original petition, the district court granted a temporary restraining order that prohibited Cassandra from, among other things, removing J.M. from Lydia's custody or possession. Thereafter, the parties' respective rights regarding J.M. were governed by a succession of temporary orders, the details of which we need not belabor here except to note that they entitled Lydia to maintain possession and/or temporary joint or sole managing conservatorship of J.M. through time of trial.

The case eventually proceeded to trial on the merits before a jury in October 2011. By now, J.M. was sixteen years of age and had started his junior year in high school. After hearing evidence, the jury (1) found that the circumstances of J.M. or of Cassandra had "materially and substantially changed" since the date of Cassandra and Paul's divorce decree; (2) failed to find that appointing Lydia as J.M.'s sole managing conservator would be in the teen's best interest; (3) but found that appointing Lydia and Cassandra as J.M.'s joint managing conservators would be in his

6

best interest.[6]  The jury further found that Lydia should have the exclusive right to designate J.M.'s primary residence, subject to the geographic restriction of Travis County.

Following additional proceedings before the court regarding possession, access, and attorney's fees, the district court signed a January 31, 2012, final order consistent with the jury's findings on conservatorship.  It also awarded Lydia monetary relief that included attorney's fees and a fifty-percent share of the child support that Paul is obligated to pay each month.  It is from this final order that Cassandra appeals.

## ANALYSIS

In a single issue on appeal, Cassandra disputes whether Lydia had standing to bring her suit to obtain managing conservatorship of J.M.  Standing is a threshold requirement for subject-matter jurisdiction, the absence of which renders a trial court action void.  *See Texas Ass'n of Bus. v. Texas Air Control Bd*., 852 S.W.2d 440, 443-44 (Tex. 1993); *Jasek v. Texas Dep't of Family & Protective Servs.*, 348 S.W.3d 523, 527 (Tex. App.—Austin 2011, no pet.).  But Lydia counters by invoking a threshold barrier to this Court's own subject-matter jurisdiction to decide her standing—she argues that the underlying controversy became moot while on appeal.  She observes that J.M. is now emancipated, having turned eighteen years of age in March 2013, and then graduated high school on June 5, 2013, and argues that these intervening events concluded any rights or duties of the parties with respect to his custody, possession, access, or support.  Consequently, Lydia reasons, the outcome of Cassandra's appeal can no longer impact the parties' rights, depriving us of jurisdiction to decide it.  *See Zipp v. Wuemling*, 218 S.W.3d 71, 73 (Tex. 2007) (per curiam)

---

[6]  *See* Tex. Fam. Code § 156.101(a)(1).

7

("An appeal is moot when a court's action on the merits cannot affect the rights of the parties."); *see also D.C. v. Texas Dep't of Family & Protective Servs.*, No. 03-11-00453-CV, 2012 Tex. App. LEXIS 3196, at *1-2 (Tex. App.—Austin Apr. 19, 2012, no pet.) (mem. op.) (holding that once the subject of a child-custody order on appeal became an adult, "there is no live controversy and this . . . appeal is moot").

In response, Cassandra acknowledges that J.M. is now emancipated[7] and that this development rendered moot any dispute regarding custody, possession, or access.[8]  But Cassandra insists that her appeal nonetheless remains live and justiciable because it also implicates financial obligations imposed by the final order that accrued prior to J.M.'s emancipation, such as the attorney's fee award and the amount of previously-accrued child support to which the parties were entitled.  We agree with Cassandra that a live controversy remains to this extent.  *See Griffin v. Birkman*, 266 S.W.3d 189, 193-94 (Tex. App.—Austin 2008, pet. denied) (recognizing that an attorney's-fees claim or award may, in some circumstances, preserve a live controversy even after the principal claims for relief have been rendered moot); *see also Marcos v. Marcos*, No. 01-96-

---

[7]  In fact, the evidence reflects that J.M. has gone on to the University of Texas at Austin, where he is studying to be an engineer.

[8]  In this regard, we note that Cassandra, through her attorney, obtained multiple briefing extensions and ultimately did not file her brief until February 2013—roughly a month before J.M.'s eighteenth birthday—and only after we ordered that no further extensions would be granted.  *See Medrano v. Zapata*, No. 03-12-00131-CV, 2013 Tex. App. LEXIS 1580, at *1 (Tex. App.—Austin Feb. 12, 2013, order) (per curiam).  Nor did Cassandra attempt to avail herself of other procedural mechanisms through which she could have presented the standing issue to us at a much earlier juncture in the case, when she might have had a realistic chance of recovering custody of J.M. before he was emancipated.  *Cf. In re Vogel*, 261 S.W.3d 917, 920 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding) (example of grandparent-standing issue being raised through mandamus challenge to temporary orders).

00215-CV, 1997 Tex. App. LEXIS 4715, at \*6 n.2 (Tex. App.—Houston [1st Dist.] 1997, no pet.) (not designated for publication) (noting conservatorship issues were not mooted when child reached eighteen because dispute encompassed claim for reimbursement of expenses incurred during conservatorship). Accordingly, we have jurisdiction—and the duty—to determine whether, as Cassandra argues, Lydia lacked standing to bring her suit.[9]

As with other issues implicating a trial court's subject-matter jurisdiction, analysis of whether Lydia has standing begins with her live pleadings. *Jasek*, 348 S.W.3d at 527 (citing *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004)).[10] We must also consider evidence presented below that is relevant to that jurisdictional issue. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000); *Texas Ass'n of Bus.*, 852 S.W.2d at 446. Because Cassandra's standing challenge comes to us through an appeal from the district court's final order, the evidentiary record potentially relevant to Lydia's standing includes the reporters' records from the trial on the merits, hearings on temporary orders, and the post-trial proceedings. *See Texas Ass'n*

---

[9] We do so without the aid of controverting appellate briefing from Lydia, who relied solely on her assertions that the appeal is now moot. However, we have considered the arguments that Lydia presented before the district court, to the extent they inform our analysis. *Cf. Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993) (observing that because standing is jurisdictional, it cannot be waived and can—and, sometimes, must—be determined sua sponte).

[10] A plaintiff has the initial burden of alleging facts that, taken as true, would affirmatively demonstrate her standing. *See Jasek v. Texas Dep't of Family & Protective Servs.*, 348 S.W.3d 523, 528 (Tex. App.—Austin 2011, no pet.) (citing *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004) (citing *Texas Ass'n of Bus.*, 852 S.W.2d at 446)). Mere unsupported legal conclusions do not suffice. *See Creedmoor–Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 515-16 & nn.7-8 (Tex. App.—Austin 2010, no pet.). We construe the pleaded facts liberally and with an eye to the pleader's intent. *Miranda*, 133 S.W.3d at 226.

*of Bus.*, 852 S.W.2d at 446; *Livingston v. Beeman*, 408 S.W.3d 566, 571 (Tex. App.—Austin 2013, pet. filed).

Although standing cannot be waived and may be raised by a party (or a court) at any time, including on appeal, *see Texas Ass'n of Bus.*, 852 S.W.2d at 445, Cassandra raised her standing challenge below both in opposition to various temporary orders and through a separate motion to dismiss that she filed shortly before trial. In each instance, the district court (either directly or through delegation to an associate judge) explicitly or impliedly determined that Lydia had standing and allowed the case to proceed. These rulings were ultimately merged into the district court's final order, which further incorporates an explicit legal conclusion that "all necessary prerequisites of the law and standing have been legally satisfied and that this Court has jurisdiction of this case and of all the parties." There were no underlying findings of fact or conclusions of law made in connection with the standing determination.[11] Consequently, we are to imply such fact findings as are necessary to support the legal conclusion that Lydia had standing, subject to challenge for legal or factual insufficiency of the evidence supporting them. *See Bacon v. Texas Historical Comm'n*, 411 S.W.3d 161, 171 (Tex. App.—Austin 2013, no pet.); *Livingston*, 408 S.W.3d at 571-72; *In re N.L.D.*, 344 S.W.3d 33, 38 (Tex. App.—Texarkana 2011, no pet.) (citing *Worford*

---

[11] The parties have referenced a docket notation made by the associate judge who presided over the initial hearing on temporary orders. The notation states that the associate judge "[f]ind[s] [the] evidence raises questions of significant impairment of emotional development of one child," phraseology somewhat similar to Family Code section 102.004(a)(1)—the sole basis on which Lydia's standing rests, as explained below. We need only observe that docket entries do not have the effect of findings of fact and conclusions of law, and do not impact our standard or scope of review. *See Rush v. Barrios*, 56 S.W.3d 88, 96 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("An appellate court may not consider docket entries since they are only made for the clerk's convenience and are usually unreliable.").

*v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Schoeffler v. Denton*, 813 S.W.2d 742, 744 (Tex. App.—Houston [14th Dist.] 1991, no writ)). However, the ultimate determination of whether particular facts presented establish Lydia's standing is one of law that we review de novo. *See Bacon*, 411 S.W.3d at 171 (citing *Miranda*, 133 S.W.3d at 226; *Creedmoor–Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 513, 516 & n.8 (Tex. App.—Austin 2010, no pet.)).

Lydia's claims are created by statute—namely, the Family Code—and her standing to assert them is likewise governed by that Code's "comprehensive statutory framework for standing in the context of suits involving the parent-child relationship." *See Jasek*, 348 S.W.3d at 528 (quoting *In re H.G.*, 267 S.W.3d 120, 124 (Tex. App.—San Antonio 2008, pet. denied)). Accordingly, Lydia had the burden of establishing her standing within the prescribed parameters of that statutory language. *See id.*; *see also Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984). Furthermore, such standing must exist as of the time Lydia filed her suit, October 12, 2010. *See In re S.M.D.*, 329 S.W.3d 8, 13 (Tex. App.—San Antonio 2010, pet. dism'd) (citing *M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 708 (Tex. 2001)); *In re Vogel*, 261 S.W.3d 917, 921 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding) (citing *Texas Ass'n of Bus.*, 852 S.W.2d at 446 n.9).

Lydia's action lies under chapter 156 of the Family Code, which governs suits to modify a court order prescribing a child's conservatorship, possession, support, or access.[12] Among those persons to whom chapter 156 confers standing to bring actions authorized under it are

---

[12] *See generally* Tex. Fam. Code §§ 156.001-.409.

those who satisfy one of the standing requirements imposed by chapter 102 of the Family Code, which governs suits affecting the parent-child relationship (SAPCRs) generally.  Tex. Fam. Code § 156.002(b) ("A person or entity who, at the time of filing, has standing to sue under Chapter 102 may file a suit for modification in the court with continuing, exclusive jurisdiction."); *see generally id.* §§ 102.001-.014.[13]  Under chapter 102, the relationship of grandparent to child is not alone considered sufficient to confer standing to bring a suit for conservatorship—to the contrary, chapter 102 embodies a strong public policy that grandparents should "not [be] entitled to disrupt the child's family life and initiate suits for managing conservatorship except in limited circumstances." *Whitworth v. Whitworth*, 222 S.W.3d 616, 622 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (op. on reh'g); *see also Troxel v. Granville*, 530 U.S. 57, 68-73 (2000).  Lydia has relied on two of the "limited circumstances" in which grandparents may have standing under chapter 102, each of which is prescribed within section 102.004.

First, Lydia alleged and presented evidence that she has had "substantial past contact" with J.M., which is one (but by no means all) of the requirements for standing under subsection (b)

---

[13] Chapter 156 additionally confers standing upon, inter alia, "[a] party affected by [the] order" sought to be modified. *Id*. § 156.002(a).  Although Lydia's live pleadings do not explicitly invoke this theory of standing, she alleges in part that she was "written into" Cassandra and Paul's 1999 divorce decree, quoting the provisions of that decree contemplating that she would serve as an intermediary in Cassandra and Paul's exchange of J.M. and C.M. and supervise his visitation with them. *See supra* note 4.  To the extent these facts could be viewed as potentially implicating section 156.002(a), they would not establish that Lydia has standing as a "party affected" by the divorce decree because she would not be considered a "party" to the divorce or decree—only Cassandra and Paul were. *See In re S.A.M.*, 321 S.W.3d 785, 789-92 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (concluding plain language of "party" in section 156.002(a) "requires that the person have been a party to the order that the person seeks to modify" not merely a "person" affected by an order); *cf. Moreno v. Perez*, 363 S.W.3d 725, 744 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (grandparents that had intervened in divorce proceedings and were granted visitation rights in decree had standing as parties "affected" by decree).

of section 102.004. *See* Tex. Fam. Code § 102.004(b). We need go no further than to observe that subsection (b) confers standing upon grandparents only to the extent of seeking to intervene in a "pending" SAPCR; i.e., joining in an existing suit through which some other person with standing to do so has already placed conservatorship at issue. *See id*; *Whitworth*, 222 S.W.3d at 621-22. Lydia's suit did not purport to intervene in a "pending" SAPCR, nor did she allege or was there evidence that any such suit was "pending" at the time she filed her action. Instead, she brought an original suit to modify the final decree that had long ago concluded the divorce proceedings between Cassandra and Paul. *See Jasek*, 348 S.W.3d at 529-30. Consequently, Lydia's own pleadings and the evidentiary record negate subsection (b) as a potential basis for her standing.

The second basis that Lydia has attempted to invoke under section 102.004 is found in subsection (a), paragraph (1), which confers standing upon a child's grandparent to initiate a SAPCR "*if there is satisfactory proof to the court that . . . the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development*." Tex. Fam. Code § 102.004(a)(1) (emphasis added). This requirement is intended to restrict grandparent standing to bring a SAPCR solely to "certain extreme circumstances," *Svoboda v. Svoboda*, No. 03-09-00189, 2009 Tex. App. LEXIS 7739, at *15 (Tex. App.—Austin Oct. 1, 2009, no pet.) (mem. op.) (quoting *Von Behren v. Von Behren*, 800 S.W.2d 919, 921 (Tex. App.—San Antonio 1990, writ denied)), and it is not enough merely to show that the child would be "well off" or even "better off" by some measure with the grandparent. *See In re S.M.D.*, 329 S.W.3d at 16 (observing that the "non-parent's burden is not met by evidence that shows she would be a better custodian of the child or that she has a strong and on-going relationship with the child" (citing *Critz v. Critz*, 297 S.W.3d 464, 474-75 (Tex. App.—Fort Worth 2009, no pet.))); *see*

13

*also Von Behren*, 800 S.W.2d at 921 (observing, with reference to an earlier version of this standing limitation, that it is "'designed to strike a balance between those grandparents . . . who undertake a rescue mission and those who are just out to do a little officious intermeddling to correct the 'unsatisfactory' childrearing methods of the younger generation.'" (quoting John J. Sampson, Texas Family Code & Commentary, 17 Tex. Tech. L. Rev. 1045, 1073 (1986))).

"Satisfactory proof to the court" as used in subsection (a), paragraph (1), denotes proof by a preponderance of the evidence. *See In re A.M.S.*, 277 S.W.3d 92, 96 (Tex. App.—Texarkana 2009, no pet.); *Von Behren*, 800 S.W.2d at 921. "Present circumstances," as previously suggested, would refer to the state of affairs that existed as of the date Lydia filed her suit—May 12, 2010. *See In re S.M.D.*, 329 S.W.3d at 13 (citing *M.D. Anderson Cancer Ctr.*, 52 S.W.3d at 708); *In re Vogel*, 261 S.W.3d at 921 (citing *Texas Ass'n of Bus.*, 852 S.W.2d at 446 n.9). At that time, it is undisputed that Cassandra had sole managing conservatorship over J.M. and was exercising her authority to require him to reside with her, notwithstanding their ongoing conflicts. The "order requested" by Lydia was to modify Cassandra's sole conservatorship in a manner that would give Lydia, not Cassandra, legal authority to control where J.M. could reside, with the ultimate objective of enabling J.M. to reside with Lydia and Arthur, as he apparently wished to do. Consequently, subsection (a), paragraph (1), required Lydia to obtain a finding by the district court, based on the preponderance of the evidence, that allowing Cassandra to continue as J.M.'s managing conservator, with exclusive control over where he resided, would, as of May 12, 2010, "significantly impair" either J.M.'s "physical health" or "emotional development." Under our standard of review, as previously explained, we must presume that the district court impliedly made this finding or findings. *See Bacon*, 411 S.W.3d at 171; *In re N.L.D.*, 344 S.W.3d at 38.

14

The thrust of Cassandra's appellate arguments is that the evidence was legally insufficient to support the implied finding that J.M.'s "present circumstances" as of May 12, 2010, would more likely than not "significantly impair" either his "physical health" or "emotional development." Much of Cassandra's focus is on disputing whether there was any evidence on which a reasonable fact-finder could rely that she, as opposed to J.M., was the aggressor in the April 2010 altercation or that any of the other alleged violence ever occurred. She emphasizes that J.M. was the sole witness to accuse her of this violent behavior, and that C.M.—the only other resident of the family's home who could give account of the events there—testified at trial that he had never witnessed Cassandra strike J.M. with her fists, and that she had never been physically violent with either J.M. or him. C.M. further corroborated Cassandra's claim that J.M. had been the aggressor during the April 2010 altercation, testifying that J.M. had instigated the violence by pushing his mother with his hands. Additionally, Cassandra also presented a number of witnesses—including friends, relatives, neighbors, and teachers—to vouch for her devotion as a mother and testify that they had not witnessed her act violently towards her children.

Yet it remains that the district court also had before it a competing account from J.M., who described a mother prone to dramatic mood swings and sudden, violent outbursts against him, and especially so after the arrival of the new twins. Although J.M. was the sole witness to make these specific claims, his twin C.M. acknowledged that Cassandra had mood swings and a temper. More significantly, although C.M. controverted J.M.'s claims of violence during his trial testimony, he had previously acknowledged, during a hearing on temporary orders, that J.M. and Cassandra had a poor relationship that would sometimes turn physically violent. Additionally, numerous other witnesses, including not only Lydia but personnel at J.M.'s high school, testified that the timing

of the alleged violence during the spring of 2010 corresponded to J.M.'s manifestation of great

emotional upset, including nausea and vomiting, pacing, difficulty sleeping, weight loss, falling

grades, and withdrawn behavior that was considered uncharacteristic of him. Witnesses likewise

recounted that J.M. cried when describing his version of the February and April incidents and that

he expressed great fear regarding the prospect of continuing to reside with Cassandra.

Cassandra points out perceived inconsistencies in J.M.'s allegations of violence and

that Child Protective Services (CPS) investigated J.M.'s allegations following his February 2010

outcry at school and ultimately "ruled out" physical or emotional abuse, citing a perceived lack of

veracity in some of his claims.[14] However, Cassandra had not asserted that CPS's inaction has any

sort of preclusive effect on the district court, nor could she.[15] Instead, her arguments ultimately assail

the district court's assessments of J.M.'s credibility and the weight to be given his testimony. While

there may have been abundant reasons for the district court to credit Cassandra's version of the facts

rather than J.M.'s, it remains that it impliedly did otherwise—and it is a fundamental limitation on

---

[14] For example, J.M. had attributed scarring on his arms to scratches inflicted by Cassandra, but the CPS investigator concluded that the scarring instead was consistent with eczema, a skin condition from which J.M. had suffered for several years.

CPS also conducted an investigation following the April incident, again with a disposition of "ruled out," and also a risk finding of "factors controlled." The report noted in its conclusion that J.M. had sustained "substantial injuries" from Cassandra biting him and scratching him, but that he was "currently in a safe home environment with [Lydia and Arthur]."

[15] *See In re Texas Dep't of Family & Protective Servs.*, 245 S.W.3d 42, 49-50 (Tex. App.—Austin 2007, orig. proceeding); *S.C.S. v. Texas Dep't of Family & Protective Servs.*, Nos. 02-09-00341-CV, 02-09-00343-CV, 2010 Tex. App. LEXIS 5851, at *8-9 (Tex. App.—Fort Worth July 22, 2010, no pet.) (mem. op.); *In re H.R.H.*, No. 04-08-00538-CV, 2009 Tex. App. LEXIS 2560, at *9-10 (Tex. App.—San Antonio Apr. 15, 2009, no pet.) (mem. op.); *see also Gates v. Texas Dep't of Family & Protective Servs.*, 252 S.W.3d 90, 95-98 (Tex. App.—Austin 2008, no pet.).

16

our power that we must defer to such assessments by a fact-finder. *See, e.g.*, *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) (trial-level fact-finders "are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary."). We are likewise required to view the evidence in the light favorable to the district court's findings, drawing reasonable inferences in their favor, and presuming that the court resolved any evidentiary conflicts in a manner supporting its findings. *See id.* at 820.

Beyond attacking the veracity of J.M.'s allegations of violence, Cassandra argues more broadly that there was no evidence J.M.'s circumstances as of May 12, 2010, would "significantly impair" his "physical health" or "emotional development," but merely reflected the immature responses of a "rebellious teenager" to a "strict parent." To be sure, Cassandra is indisputably free of many of the deleterious parental traits and behaviors often found in the cases holding that grandparents have standing under section 102.004(a)(1).[16] And we emphatically reject any suggestion that section 102.004(a)(1)'s "extraordinary circumstances" can be shown by mere second-guessing of whether a parent is "too strict" with a child or should allow a teen more "independence," as some of the witnesses supportive of Lydia and J.M. seemed to do at times. *See*

---

[16] *See, e.g.*, *In re N.L.D.*, 344 S.W.3d 33, 38-39 (Tex. App.—Texarkana 2011, no pet.) (great-grandmother had standing based on evidence that parent had failed to submit to drug test, had abused drugs in the past and was still doing so, had failed to take child to scheduled doctor visits despite child's heart condition, and had attempted to run over child's father with her car); *In re Vogel*, 261 S.W.3d at 922 (grandparent had standing based on testimony that child's father was long-term alcoholic who could not financially provide for child's needs); *In re R.D.Y.*, 51 S.W.3d 314, 318-19, 325 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (grandmother had standing when record showed that mother physically abused child, was homeless and unemployed, did not feed or bathe child, and was involuntarily committed to psychiatric treatment facility).

17

*Von Behren*, 800 S.W.2d at 921. But there was also evidence that, viewed in the light favorable to the district court's findings, Cassandra had exhibited recurrent violent behavior toward J.M. through sudden and explosive outbursts that entailed punching, biting, slapping, and hair-pulling, and that the intensity of these episodes, and their propensity to recur, had increased during the months immediately preceding Lydia's filing of suit. There was also evidence that these episodes, and J.M.'s perception that they would continue to occur, gave rise to ongoing emotional distress with accompanying physical manifestations, including stress-induced vomiting, sleeplessness, crying episodes, and fear, resembling the proof that suffices to establish compensable mental anguish.[17] Further, a reasonable fact finder could have concluded that these episodes—and their effects upon J.M.—would continue to recur, all other things being equal, as long as the teen resided with Cassandra.

We are compelled to conclude that these facts—if, as we must assume, they were believed by the fact-finder—would be sufficient to enable a reasonable fact-finder to determine that J.M.'s circumstances as of May 12, 2010, would "significantly impair" if not his physical health, at least his emotional development, in the sense contemplated by Family Code section 102.004(a)(1). These implied findings, in turn, would establish Lydia's standing to bring her action. Accordingly, we must overrule Cassandra's single issue.

---

[17] I.e., "direct evidence that the nature, duration, and severity of mental anguish was sufficient to cause, and caused, . . . a substantial disruption in the plaintiff's daily routine" or other evidence of "a high degree of mental pain and distress," that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011); *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).

## CONCLUSION

We affirm the district court's final order.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Field

Affirmed

Filed:   December 31, 2013